# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

———————————

**No. ACM 39815**

———————————

**UNITED STATES**
*Appellee*

v.

**Manuel PALACIOS CUETO**
Airman First Class (E-3), U.S. Air Force, *Appellant*

———————————

Appeal from the United States Air Force Trial Judiciary

Decided 18 May 2021

———————————

*Military Judge*: Matthew N. McCall.

*Sentence:* Sentence adjudged on 24 August 2019 by GCM convened at Hanscom Air Force Base, Massachusetts. Sentence entered by military judge on 15 October 2019: Bad-conduct discharge and reduction to E-1.

*For Appellant:* Major Amanda E. Dermady, USAF.

*For Appellee*: Lieutenant Colonel Brian C. Mason, USAF; Lieutenant Colonel Matthew J. Neil, USAF; Major John P. Patera, USAF; Captain Cortland T. Bobczynski, USAF; Mary Ellen Payne, Esquire.

Before POSCH, RICHARDSON, and MEGINLEY, *Appellate Military Judges.*

Judge RICHARDSON delivered the opinion of the court, in which Senior Judge POSCH joined. Judge MEGINLEY filed a separate opinion dissenting in part and in the result.

———————————

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

———————————

RICHARDSON, Judge:

A general court-martial comprised of officer and enlisted members convicted Appellant, contrary to his pleas, of two specifications of abusive sexual contact in violation of Article 120, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 920.[1,2] The court-martial sentenced Appellant to a bad-conduct discharge, to perform hard labor without confinement for 90 days, and reduction to the grade of E-1. The convening authority disapproved the adjudged hard labor without confinement, and took no additional action on the sentence.[3]

Appellant raises eight issues on appeal: (1) whether his convictions for a kiss on the lips and a touch of the stomach are factually and legally sufficient; (2) whether his due process rights were violated when the Government argued the victim was incapable of consenting to a kiss due to impairment by alcohol when Appellant was charged with causing bodily harm; (3) whether the military judge erred by denying the panel members' request to review Appellant's statements to investigators; (4) whether the military judge erred by denying the Defense challenge for cause of a panel member; (5) whether Appellant's trial defense counsel were ineffective; (6) whether trial counsel committed prosecutorial misconduct when stating that they represented "the pursuit of justice" and argued that justice would only be served if Appellant was convicted and adjudged a sufficient punishment; (7) whether the record of trial is incomplete; and (8) whether the cumulative-error doctrine requires relief. Issue (7) was resolved before Appellant submitted his reply brief.[4] We have carefully considered issue (4) and find that it does not warrant further discussion or relief. *See United States v. Matias*, 25 M.J. 356, 361 (C.M.A. 1987). Based on

---

[1] All references in this opinion to the punitive articles of the Uniform Code of Military Justice (UCMJ) are to the *Manual for Courts-Martial, United States* (2016 ed.) (2016 *MCM*). The charges and specifications were referred to trial after 1 January 2019; as such, all other references to the UCMJ, Military Rules of Evidence, and Rules for Courts-Martial (R.C.M.) are to the *Manual for Courts-Martial, United States* (2019 ed.). *See* Exec. Order 13,825, §§ 3 and 5, 83 Fed. Reg. 9889, 9890 (8 Mar. 2018).

[2] Appellant was acquitted of one specification of sexual assault, also charged as a violation of Article 120, UCMJ.

[3] Consistent with our respective opinions in *United States v. Barrick*, No. ACM S32579, 2020 CCA LEXIS 346 (A.F. Ct. Crim. App. 30 Sep. 2020) (unpub. op.), we find no error in the convening authority's decision to "take no further action on the sentence in this case."

[4] We granted the Government's motion to attach documents reflecting Appellant's counsel's receipt of items that had been missing from its copy of the record of trial.

our resolution of the remaining issues, we find no merit to issue (8).[5] Finding no error that has materially prejudiced Appellant's substantial rights, we affirm the findings and sentence.

## I. BACKGROUND

The conduct at issue in Appellant's court-martial arose during several hours Appellant spent with MT over Memorial Day weekend in 2018.

Appellant and MT had known each other for about three months after meeting in their dorm building on Hanscom Air Force Base, Massachusetts. They both spoke Spanish and grew up outside the United States. They were older than most Airmen of their rank. MT often rejected Appellant's invitations to socialize with her, and they were not close friends.

Over the long weekend, MT wanted to eat at a Honduran restaurant in Boston, about a 40-minute drive from the base. She invited Appellant because she wanted company, and she wanted someone who could parallel park her car. Appellant accepted and joined her on the outing.

After dinner, they went briefly to one bar before going to another. At the second bar, MT consumed about five vodka drinks. They stayed at the second bar between two and four hours, until it closed. MT felt drunk at this point; Appellant may have had drinks at dinner and at a bar, but was not drunk. Appellant drove them back to base, and they decided to keep drinking. After arriving at their dorm, they went to their own rooms; MT changed into shorts, and Appellant got a bottle of pisco.[6] They met back up, and Appellant drove to the back of the "BX," where they were "just hanging out" in the car. Next he drove to the back of the Civil Engineer (CE) building and parked. MT sat on the roof of her car with her legs dangling through the sunroof. Appellant was passing MT pisco shots through the sunroof opening; MT drank five-to-six shots. MT did not know whether Appellant drank any of the pisco. At one point, Appellant rubbed MT's legs, prompting MT to ask him why he was doing that. He responded that he "miss[ed] touching a woman." MT told him to stop and he did.

MT did not remember leaving the CE area and returning to her dorm. However, the dorm-building cameras captured Appellant and MT walking through the dayroom, continuing down the hallway to MT's room, then entering MT's

---

[5] We will set aside the findings or sentence, as appropriate, if the cumulative effect of all plain and preserved errors denied an appellant a fair trial. *United States v. Pope*, 69 M.J. 328, 335 (C.A.A.F. 2011). "Assertions of error without merit are not sufficient to invoke this doctrine." *United States v. Gray*, 51 M.J. 1, 61 (C.A.A.F. 1999).

[6] MT testified pisco is a hard liquor similar to vodka.

room. Leading to the dayroom, the first video shows Appellant guiding MT forward, walking next to her with his hand on her back or shoulder and his other hand holding her hand (her arm was raised parallel to the ground). The video of the dayroom shows MT attempting to walk in front of Appellant to enter the main part of the dayroom instead of walking straight through, but Appellant stayed at her side, and she continued moving in the original direction. She stopped and bent over at the waist. It appeared she either needed Appellant's assistance to keep from falling over, or she was trying to get around and walk past him; a pillar obscures the view somewhat. Appellant helped MT stand upright again. MT moved past Appellant, continuing in the original direction, then fell over onto her back with her arms bent and hands up near her head. Appellant tripped over MT and fell to the ground face down, with his legs over MT's torso. Appellant got up on his feet, but MT stayed motionless. Appellant adjusted a cross-body bag he was wearing, leaned over MT with his hands below MT's armpits, and kissed her on the lips. MT then moved and pushed him away with her hands. Appellant helped MT to her feet. MT struggled to remain standing as she was very unsteady on her feet. The pillar again obscures the view of what occurred at this point. Then they continued to walk through the dayroom.

The second video shows Appellant and MT walking down the dorm hallway. Appellant was positioned behind MT, with his legs on either side of her legs. Appellant's right arm was over her right shoulder and his left arm was holding her left arm, then shifted to around her torso. When they arrived at MT's room, Appellant was still holding MT from behind and was leaning his head over her shoulder. MT leaned with both her hands against the door, then moved to the side, then moved again where she was facing the camera and can be seen looking through her purse. She turned towards the door, then turned again, away from the camera. During the two minutes they were outside her door, Appellant was either next to MT or directly behind and touching MT with his hands or body, sometimes with his head over her shoulder. Appellant apparently opened the door, and MT walked in, followed by Appellant. The time on the video was "07:29," which was generally consistent with other evidence about the time that morning.

MT testified to her memory of the events captured on the videos. She recalled that she was trying to put her key in her door, and finally did. She remembered entering her dorm room, explaining, "[I]n my head – in the back of my head, I was by myself." Regarding the earlier events, MT needed her memory refreshed. After the Government played the video recordings during her testimony, MT explained that she also remembered some of the dayroom-portion of the evening. She testified she remembered Appellant kissing her on the lips, and that she did not consent. She said she was pulling away from him because she "didn't want to get touched by him." Unlike when she said no to

4

Appellant touching her legs in the car, she said she was too intoxicated to "defend" herself. She did not remember what happened behind the pillar, or being held by Appellant leading up to her room, even after seeing the video.

MT testified Appellant had never been in her dorm room before, and that she thought she entered her room alone. She noticed Appellant was in her room when she was using the toilet: "I don't know what he was trying to do, but he went inside my restroom while I was urinating, he . . . . saw me while I had my underwear down[,] . . . . [a]nd then he left." She testified that she was very confused, and soon after using the toilet she went to the bed and lay down, still wearing her shirt, shorts, and underwear. She did not see him lying on the bed. MT testified the last thing she remembered feeling was being touched on her stomach, adding "[i]t was very, very blurry."

MT's next memory is several hours later, when she awoke to Appellant in her bed, dressed only in his underwear briefs. She confronted him about being in her room. She asked Appellant if he violated her, and he denied touching her. She also confronted him about walking in on her when she was on the toilet, and did not accept his explanation that he was just checking to see that the door was locked. She told him to leave her room, and he did. The video shows Appellant walked shirtless from MT's room back in the direction of the dayroom at "13:56" that afternoon.

MT testified she felt disgusted, dirty, and used. She felt sharp pain in her vaginal area, a sensation that was not there the day before. Thinking Appellant had sexually assaulted her, MT went to his room to return his shirt and confront him. She told him she was in pain in her genital area, she "needed to get help because [she] felt destroyed as a person, like, broken," and they "can't be in the same place anymore." Appellant denied that anything happened. MT directly asked Appellant whether he intended to have sex with her. MT testified as to Appellant's response, "Yes, I intended having [sic] sex with you. But as soon as you passed out I said no, I'm not going to touch you anymore." MT returned to her room. MT testified she vomited that day, sometime after she woke up and not before.

Appellant sent MT broad, deep apologies via text message.[7] For example, in one text he said to MT, "I do not expect that one day to another you will recover from this, forgive me," and in another he said, "I truly regret this, I never meant to hurt you, I am sorry." He also said she was "free to report" him and acknowledged his "mistake" but did not admit to any act in particular. Appellant also sent MT information about the base Sexual Assault Response

---

[7] The texts were written in Spanish. Photos of the texts and a translation into English were entered into evidence.

Coordinator (SARC). MT described it as "this sexual assault picture of the SARC numbers to call."

Appellant contacted his first sergeant to talk about what happened earlier that day. Appellant told him he had been out with a female friend the night before, drinking and hanging out in the dorms. The first sergeant testified, "[Appellant] mentioned something about that they had been kissing." Appellant said he helped her back to her room and went into the dorm bathroom to make sure the suite-mate door was locked. He also said she threw up, and he stayed to help clean the vomit. He said MT fell asleep as he continued to clean the vomit, then he got into bed with her and went to sleep. The first sergeant read Appellant his rights under Article 31, UCMJ, 10 U.S.C. § 831, from a card, in case Appellant was admitting to sexual assault. Appellant denied committing a sexual assault and "did not seem to want a lawyer." The first sergeant thought Appellant wanted mentorship and was not admitting a crime.

MT called the SARC the same day as the alleged offenses and went to speak with the SARC in person on the next duty day. After speaking to the SARC, MT went to the hospital where she underwent a sexual assault examination. The examination revealed some redness, or erythema, to part of the vagina, the posterior fourchette. The nurse who conducted the exam testified, "So usually you see redness when you have friction, or anything rubbing against that area. It's the bottom entrance of the vagina. So it usually – it's the most common site of injury of sexual assault patients."[8]

AFOSI agents seized clothing MT and Appellant wore on the night in question, and sent it to the United States Army Criminal Investigations Laboratory (USACIL) for analysis. Mr. JF from USACIL analyzed the inside crotch area of the underwear each was wearing, as well as MT's shorts. Mr. JF provided testimony about his findings after being accepted by the court as an expert in forensic biology and DNA examinations. His examination indicated Appellant's DNA was on MT's underwear and shorts, and MT's DNA was on Appellant's underwear. No sperm was detected. Mr. JF opined that MT's and Appellant's DNA recovered from the other person's item of underwear came from a

---

[8] Trial defense counsel objected to a later question asking whether she formed an opinion as to what caused the redness in this case, which the military judge sustained. The military judge did not *sua sponte* tell the members to disregard her earlier testimony.

bodily fluid and not from touch.[9] Mr. JF could not opine whether Appellant's DNA on MT's shorts could have come from a touch. Moreover, Mr. JF testified, "Given the evidence, it's my opinion that some form of intimate contact would have to have occurred to deposit DNA inside the front crotch of the underwear." He also opined that the presence of the DNA was the result of a primary and not a secondary transfer.[10] The Defense's DNA expert disagreed, opining a "long and vigorous . . . . secondary transfer could potentially result in a level of DNA that is in the realm of the amount we're talking about here."

## II. DISCUSSION

### A. Legal and Factual Sufficiency

Appellant asserts that the evidence for the two offenses of which he was convicted—kissing MT while she was on the dayroom floor causing bodily harm and touching her stomach while she was in her bed and incapable of consenting—was legally and factually insufficient. For both, Appellant asserts that MT was not a credible witness. Appellant argues that the Government did not meet its burden of disproving mistake of fact as to consent to the kiss, suggesting he reasonably believed she consented to this sexual act. Appellant argues an opposing theory regarding the stomach touching: that the Government did not meet its burden of proving Appellant had the intent to gratify his sexual desire. We are not persuaded and find Appellant's convictions both legally and factually sufficient.

#### 1. Law

We review issues of legal and factual sufficiency de novo. *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002) (citation omitted). Our assessment of legal and factual sufficiency is limited to the evidence produced at trial. *United States v. Dykes*, 38 M.J. 270, 272 (C.M.A. 1993) (citations omitted).

"The test for legal sufficiency is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Robinson*, 77 M.J. 294, 297–98 (C.A.A.F. 2018) (quoting *United States*

---

[9] Mr. JF used the terms "bodily fluid" and "biological fluid" interchangeably. He described kinds of bodily fluids, to include blood, seminal and vaginal fluid, nasal secretions, sweat, and breast milk, and stated "[t]ypically, biological fluids contain more DNA than just random touch samples."

[10] The expert testified about transfers using the example of shaking another person's hand. The handshake between two people (A and B) is a primary transfer of the other person's DNA. When A shakes C's hand, recovery of B's DNA on C's hand would be the result of a secondary transfer through A.

*v. Rosario*, 76 M.J. 114, 117 (C.A.A.F. 2017)). "The term reasonable doubt, however, does not mean that the evidence must be free from conflict." *United States v. Wheeler*, 76 M.J. 564, 568 (A.F. Ct. Crim. App. 2017) (citing *United States v. Lips*, 22 M.J. 679, 684 (A.F.C.M.R. 1986)), *aff'd*, 77 M.J. 289 (C.A.A.F. 2018). "[I]n resolving questions of legal sufficiency, we are bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001) (citations omitted). As a result, "[t]he standard for legal sufficiency involves a very low threshold to sustain a conviction." *United States v. King*, 78 M.J. 218, 221 (C.A.A.F. 2019) (alteration in original) (citation omitted). The "government is free to meet its burden of proof with circumstantial evidence." *King*, 78 M.J. at 221 (citations omitted).

The test for factual sufficiency is "whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, [we are ourselves] convinced of the [appellant]'s guilt beyond a reasonable doubt." *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987). "In conducting this unique appellate role, we take 'a fresh, impartial look at the evidence,' applying 'neither a presumption of innocence nor a presumption of guilt' to 'make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt.'" *Wheeler*, 76 M.J. at 568 (alteration in original) (quoting *Washington*, 57 M.J. at 399).

### 2. Analysis

#### a. Abusive Sexual Contact – Bodily Harm

The elements of the Specification of the Additional Charge alleging abusive sexual contact in violation of Article 120, UCMJ, of which Appellant was convicted include: (1) that Appellant committed sexual contact upon MT by touching MT's lips and mouth with his lips and mouth; (2) that Appellant did so by causing bodily harm to MT; and (3) that Appellant did so with the intent to gratify his sexual desire. *See Manual for Courts-Martial, United States* (2016 ed.) (*MCM*), pt. IV, ¶ 45.b.(8)(b). "Bodily harm" includes "any nonconsensual sexual act or nonconsensual sexual contact." *MCM*, pt. IV, ¶ 45.a.(g)(3). "The term 'consent' means a freely given agreement to the conduct at issue by a competent person." *MCM*, pt. IV, ¶ 45.a.(g)(8)(A). An "incompetent person cannot consent." *MCM*, pt. IV, ¶ 45.a.(g)(8)(B).

The affirmative defense of mistake of fact as to consent requires that an accused, because of ignorance or mistake, incorrectly believe that another consented to the sexual contact. *See* Rule for Courts-Martial (R.C.M.) 916(j)(1). In order to rely on this defense, the accused's belief must be honest and reasonable. *See id.*; *United States v. Jones*, 49 M.J. 85, 91 (C.A.A.F. 1998) (quoting

*United States v. Willis*, 41 M.J. 435, 438 (C.A.A.F. 1995)); *United States v. Gans*, No. ACM 39321, 2019 CCA LEXIS 162, at *14 (A.F. Ct. Crim. App. 11 Apr. 2019) (unpub. op.). Once raised, the Government bears the burden to prove beyond a reasonable doubt that the defense does not exist. R.C.M. 916(b)(1); *see United States v. McDonald*, 78 M.J. 376, 379 (C.A.A.F. 2019). The "burden is on the actor to obtain consent, rather than the victim to manifest a lack of consent." *McDonald*, 78 M.J. at 381. An "[a]ppellant's actions could only be considered innocent if he had formed a reasonable belief that he had obtained consent. The Government only need[s] to prove that he had not done so to eliminate the mistake of fact defense." *Id.*

The Government's primary evidence proving sexual contact by bodily harm was the video recording of the offense. A reasonable finding from viewing the video is Appellant lowered himself above MT while she was lying motionless on the dayroom floor and kissed MT on her lips, and MT responded by pushing him away with her hands. Additionally, Appellant told his first sergeant he kissed MT. MT testified she did not consent to this kiss, and the evidence indicates MT did not demonstrate a desire to be kissed. Similarly, the evidence indicates Appellant would not have reasonably thought he obtained MT's consent to kiss her. Finally, Appellant's comments to MT that he missed touching a woman and that he had intended to have sex with her that day are circumstantial evidence of his intent at the time of the kiss. A reasonable inference from the video of the offense, the video of them outside her room, and other evidence admitted is that Appellant kissed MT to gratify his own sexual desire and did so without her consent.

### b. Abusive Sexual Contact – Incapable of Consenting

The elements of Specification 2 of the Charge alleging abusive sexual contact in violation of Article 120, UCMJ, for which Appellant was convicted include: (1) that Appellant committed sexual contact upon MT by touching MT's stomach with his hand;[11] (2) that MT was incapable of consenting to the sexual contact due to impairment by alcohol; (3) that Appellant knew or reasonably should have known of MT's impairment; and (4) that Appellant did so with the intent to gratify his sexual desire. *See MCM*, pt. IV, ¶ 45.b.(8)(f). The touching in a sexual contact "may encompass both body-to-body contact and object-to-body contact." *United States v. Schloff*, 74 M.J. 312, 314 (C.A.A.F. 2015).

The Government's primary evidence proving abusive sexual contact upon a person incapable of consenting due to intoxication by alcohol was MT's testimony and the video recording of Appellant and MT at the dorm that morning.

---

[11] The military judge granted the Defense's motion pursuant to R.C.M. 917, finding Appellant not guilty of the words "and [MT's] thighs" as alleged in this specification.

The testimony at trial about how much alcohol MT and Appellant drank leading up to the offenses can reasonably lead to a finding that Appellant was not intoxicated, and he knew that MT was very intoxicated. The video shows MT stumbling as she walked through her dorm, and Appellant trying to hold her up as he walked directly behind her. The video also shows MT—with Appellant still behind her—standing at the door to her room searching through her purse for about two minutes to find her key and enter her room. MT testified she did not know that Appellant followed her into her room until she saw him looking at her while she was on the toilet. A reasonable finding from the evidence is that MT, due to her intoxication, did not have the physical and mental ability to consent[12] to Appellant touching her stomach a short time later when she lay in bed, and Appellant knew or should have known of her condition.

The most telling evidence of Appellant's intent to gratify his sexual desire is his own words to MT about his mindset at the time he was touching her. Immediately before she passed out on her bed, MT remembered Appellant touching her stomach. MT testified Appellant later admitted to her he wanted to have sex with her and stopped touching her when she fell asleep. Additionally, evidence of Appellant's DNA on the inside crotch of MT's underwear and shorts, as well as Mr. JF's opinion that some form of direct intimate contact occurred, supports a reasonable conclusion that Appellant touched other parts of MT that day, and his contact with her was sexual.

Although Appellant was charged with touching MT "with his hand," the Government did not provide direct evidence that Appellant used his hand as opposed to another part of his body or an object. However, based on the circumstantial evidence presented, the court members reasonably could find Appellant guilty as charged. *See* R.C.M. 918(c) ("Findings may be based on direct or circumstantial evidence.") The military judge accurately advised the members they are "expected to use [their] own common sense and knowledge of human nature and the ways of the world" and they "should consider the inherent probability or improbability of the evidence." *See also* R.C.M. 918(c), Discussion. Appellant used his hand when he touched MT's leg in the car and said he "missed touching a woman," and when he escorted MT through the dorm to her room. When Appellant admitted to MT he had been touching her before she "passed out," a reasonable inference is he used the body part he had used before when he touched her leg—and that commonly is used to touch someone else to gratify one's sexual desire—his hand, or a part thereof.

---

[12] The military judge properly instructed the members that an "incompetent person cannot consent," which includes "a person who lacks either the mental or physical ability to consent because" she is "impaired by [an] intoxicant." *See United States v. Pease*, 75 M.J. 180, 185–86 (C.A.A.F. 2016).

We conclude that a rational factfinder could have found beyond a reasonable doubt all the essential elements of Appellant's convicted offenses. Furthermore, in assessing factual sufficiency, after weighing all the evidence in the record of trial and having made allowances for not having personally observed the witnesses, we are convinced of Appellant's guilt beyond a reasonable doubt. Therefore, we find Appellant's convictions both legally and factually sufficient.

**B. Fair Notice — Theory of Bodily Harm**

**1. Additional Background**

The Government first gave the members the impression that its theory of the kissing, as charged in the Specification of the Additional Charge, was that MT was too incapacitated to consent, but its evidence and argument made clear its theory was lack of consent and not incapacitation.

In opening statement, assistant trial counsel explained the dorm videos, marked as Prosecution Exhibit 1, would show:

> [MT] is so inebriated she does not understand what's happening. Eventually, she's able to push [Appellant] off and stop that from happening any further.
>
> . . . .
>
> . . . And as I said earlier when I started, she passes out. And that's when [Appellant] leans over her, and he fixes a purse that he was carrying, and he kisses her on the lips without her consent. Because she couldn't consent, because she was so inebriated."[13]

Immediately after trial counsel's opening statement, civilian defense counsel sought to counter trial counsel's claim that MT was too incapacitated to consent. He asked to show the video in his opening statement. He told the members, "I'm going to show you the video, because I don't think the video is completely consistent with that opening statement that you just heard. And I don't want you sitting here for two days thinking that." Prosecution Exhibit 1 was played to the members during the defense opening statement.

In closing argument, trial counsel started with the kissing allegation. He focused on lack of consent as manifested through MT's conduct only; he did not argue she was incapable of consenting. He referenced the part of the military

---

[13] The Government tried to show the members Prosecution Exhibit 1 during this part of its opening statement, but it would not play. The technical difficulties were resolved after the Government's opening statement ended.

judge's definition of consent stating it was a freely given agreement to engage in the conduct. He continued,

> When she's laying [sic] on the ground, with her hands up, and her head back, is she indicating that she wants to kiss? Is that freely given? Or does she manifest the lack of consent through words or conduct?

> Now you'll remember that after she was kissed by [Appellant], she takes her arm and she pushes him off. That's what we call an expression of lack of consent through conduct.

Trial counsel made a clear break from his argument about the kissing to the other specifications, which alleged an incapacity to consent based on intoxication.

### 2. Law

"Due process requires 'fair notice' that an act is forbidden and subject to criminal sanction" before a person can be prosecuted for committing that act. *United States v. Vaughan*, 58 M.J. 29, 31 (C.A.A.F. 2003) (citing *United States v. Bivins*, 49 M.J. 328, 330 (C.A.A.F. 1998)).

"Opening statements are not evidence." *United States v. Turner*, 39 M.J. 259, 262 (C.A.A.F. 1994) (citation omitted).

### 3. Analysis

Appellant does not assert that he was not on notice that his conduct would subject him to criminal prosecution. As such, his reliance on the Due Process Clause[14] is misplaced. Appellant asserts, essentially, that he was not on notice that the Government's theory of "bodily harm" to MT included her incapacitation by intoxication to consent to the alleged kissing. On appeal the Government asserts Appellant was in fact prosecuted for the kissing on a theory of failure to consent—before the victim became incapacitated. We agree with the Government that at trial it pursued a theory of lack of consent, not inability to consent. Even MT admitted that at the time of the kiss, she was still capable of consenting and did not consent, but at the time of the stomach touching in her room, she was not able to consent. We do not find the assistant trial counsel's opening statement suggesting otherwise to be of a constitutional magnitude, nor was it so misleading or confusing that any substantial right of Appellant was materially prejudiced.

---

[14] U.S. CONST. amend. V.

## C. Court-Members' Requested Evidence

Appellant contends the military judge erred when he denied the court-members' request to receive statements Appellant made to Air Force Office of Special Investigations (AFOSI) agents. We disagree.

### 1. Additional Background

Appellant made statements to AFOSI agents during their investigation. At trial, starting with the Defense's cross-examination of an AFOSI agent, counsel for both sides elicited testimony regarding Appellant's statements as reflected in the AFOSI report of investigation (ROI). The circuit trial counsel referenced some of Appellant's statements in his closing argument.

While the court was closed for deliberations on findings, the court members told the bailiff they had a question: they wanted the AFOSI ROI. The military judge held a session outside the presence of the members pursuant to Article 39(a), UCMJ, 10 U.S.C. § 839(a), to hear the parties' view on the request. The military judge said he intended to "tell them no, that the rules of evidence control what comes in, and that didn't come in. They have the evidence that they're going to get, and it's not going to be the Report of Investigation." Both counsel concurred, but civilian defense counsel wanted to know whether the members wanted something specific from the ROI, and circuit trial counsel wondered whether they wanted to request a specific witness. Both counsel and the military judge agreed the members had the right to ask for evidence.

The military judge opened the court and told the members "the entire OSI Report of Investigation is not admissible." The military judge added, "If, however, there is some piece of evidence from a witness that you're requesting, . . . you can ask for that. And then again, we'll have to make a determination whether that is admissible for that specific piece of evidence or witness." The court president specified, "We were just wondering if we could see any statements that [Appellant] had made to the OSI agents. Yeah, anything that's admissible."

In a subsequent Article 39(a), UCMJ, session, the Government objected based on hearsay. The Defense stated it "would not object to the presentation of that evidence," noted the military judge's "discretion is wide," and concluded it would not oppose him exercising his discretion in admitting it. The Government[15] argued the members are not a party, so Mil. R. Evid. 801, which states out-of-court statements by a party opponent are not hearsay, was not applicable. He added, "And the only way for the statement of the accused to become admissible is when the government offers it against the accused at a court-

---

[15] The transcript attributes the Government's arguments to the civilian defense counsel, but it is clear from context that a trial counsel was speaking.

martial. That's the only reason it's not admissible." The military judge ruled the evidence was inadmissible, adding, "I do believe the government controls admissions by the accused; elected not to put those statements in." The military judge opened the court, and told the members, "So the statements from [Appellant] that were not admitted during the course of the trial are not admissible. And so you will not be getting any of them. Again, if there other [sic] pieces of evidence that—or witnesses that you do want to ask, don't hesitate." The court members did not ask to hear from any witness but did ask for some other evidence.[16]

### 2. Law

Court members may request evidence. *See* R.C.M. 801(c), 921(b); *see also* Article 46, UCMJ, 10 U.S.C. § 846 (providing the court-martial equal opportunity as counsel for the Government and the accused to obtain witnesses and other evidence). However, "the right of the court members to obtain additional evidence is not absolute." *United States v. Lampani*, 14 M.J. 22, 26 (C.M.A. 1982). "The right of the members to have additional evidence obtained is subject to an interlocutory ruling by the military judge." R.C.M. 801(c). When members request evidence after the court has closed, "[t]he military judge may, in the exercise of discretion, grant such request." R.C.M. 921(b).

"We review a military judge's decision to admit or exclude evidence for an abuse of discretion." *United States v. Bess*, 75 M.J. 70, 73 (C.A.A.F. 2016) (citation omitted). We find an abuse of discretion when the military judge's "findings of fact are clearly erroneous, the court's decision is influenced by an erroneous view of the law, or the military judge's decision on the issue at hand is outside the range of choices reasonably arising from the applicable facts and the law." *United States v. Miller*, 66 M.J. 306, 307 (C.A.A.F. 2008) (citations omitted). "This standard requires more than just our disagreement with the military judge's decision." *Bess*, 75 M.J. at 75 (citation omitted).

Hearsay is an out-of-court statement offered for the truth of the matter asserted, and generally is not admissible on the merits. *See United States v. Finch*, 79 M.J. 389, 394 (C.A.A.F. 2020); Mil. R. Evid. 801(c), 802. A statement made by an opposing party is not hearsay if offered against the opposing party. Mil. R. Evid. 801(d)(2)(A).

---

[16] The court members asked for an index of exhibits and numbers related to the DNA analysis. The former was not provided to them; the latter was provided.

**3. Analysis**

Appellant asserts on appeal that "statements of an accused are admissible under Mil. R. Evid. 801(d)(2)," the Government "opened the door to these statements during [the special agent's] testimony," and the military judge should have analyzed factors under *United States v. Lampani*, 14 M.J. 22 (C.M.A. 1982).[17] We find the military judge did not abuse his discretion when he declined to provide the members Appellant's statements from the AFOSI ROI.

Appellant's statements to AFOSI agents in the ROI were hearsay. Appellant was a party opponent of the Government, and not the court members. The military judge did not err when he sustained the Government's objection to the requested evidence as inadmissible hearsay.

To the extent Appellant's second argument—that the Government "opened the door" to these statements—implicates Mil. R. Evid. 106 or 304(h) regarding completeness of statements,[18] we consider the issue waived. *See United States v. Clifton*, 71 M.J. 489, 491 (C.A.A.F. 2013) (finding trial defense counsel's "no objection" response to the military judge's denial of a panel member's request to call additional witnesses for questioning waived the issue). The Defense had the opportunity to make such arguments in support of admission of the requested evidence. Instead, the Defense was neutral, inviting the military judge to exercise his wide discretion. We decline to pierce Appellant's waiver under Article 66, UCMJ, 10 U.S.C. § 866.

Finally, we find no error in the military judge's resolution of this matter without specific reference to the non-exhaustive factors in *Lampani*, a case which is easily distinguished from the present case. In *Lampani*, 14 M.J. at 24, the court members requested a witness be recalled, and the military judge summarily denied the request. Here, the court members requested no witnesses; they requested evidence. As such, the *Lampani* factors are not particularly helpful. The military judge considered the parties' positions and applied the Military Rules of Evidence before determining the evidence would not be

---

[17] "Difficulty in obtaining witnesses and concomitant delay; the materiality of the testimony that a witness could produce; the likelihood that the testimony sought might be subject to a claim of privilege; and the objections of the parties to reopening the evidence are among the factors the trial judge must consider." *United States v. Lampani*, 14 M.J. 22, 26 (C.M.A. 1982).

[18] Mil. R. Evid. 106 states, "If a party introduces all or part of a writing or recorded statement, an adverse party may require the introduction, at that time, of any other part—or any other writing or recorded statement—that in fairness ought to be considered at the same time." Mil. R. Evid. 304(h) states, "If only part of an alleged admission or confession is introduced against the accused, the defense, by cross-examination or otherwise, may introduce the remaining portions of the statement."

admitted over the Government's objection. He did not demonstrate an errone-ous view of the law, and did not abuse his discretion.

## D. Allegations of Ineffective Assistance of Counsel

Appellant alleges that he was denied effective assistance of counsel. He asks this court to consider five deficiencies in the performance of trial defense counsel: (1) failure to file a motion to suppress Appellant's statements to his first sergeant; (2) ineffective cross-examination of MT; (3) failure to object to findings instructions and the Government's argument regarding bodily harm; (4) failure to submit a timely discovery request; and (5) preparation of an inef-fective sentencing case.

### 1. Law

The Sixth Amendment[19] guarantees an accused the right to effective assis-tance of counsel. *United States v. Gilley*, 56 M.J. 113, 124 (C.A.A.F. 2001). We review allegations of ineffective assistance de novo. *United States v. Gooch*, 69 M.J. 353, 362 (C.A.A.F. 2011) (citing *United States v. Mazza*, 67 M.J. 470, 474 (C.A.A.F. 2009)). In assessing the effectiveness of counsel, we apply the stand-ard set forth in *Strickland v. Washington*, 466 U.S. 668, 687 (1984), and begin with the presumption of competence announced in *United States v. Cronic*, 466 U.S. 648, 658 (1984). *Gilley*, 56 M.J. at 124 (citing *United States v. Grigoruk*, 52 M.J. 312, 315 (C.A.A.F. 2000)). "Our scrutiny of a trial defense counsel's performance is 'highly deferential,' and we make 'every effort . . . to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate conduct from counsel's perspective at the time.'" *United States v. Akbar*, 74 M.J. 364, 379 (C.A.A.F. 2015) (omission in original) (quoting *Strickland*, 466 U.S. at 689).

We will not second-guess reasonable strategic or tactical decisions by trial defense counsel. *Mazza*, 67 M.J. at 475 (citation omitted). "Defense counsel do not perform deficiently when they make a strategic decision to accept a risk or forego a potential benefit, where it is objectively reasonable to do so." *United States v. Datavs*, 71 M.J. 420, 424 (C.A.A.F. 2012) (citing *Gooch*, 69 M.J. at 362–63). The burden is on the appellant to demonstrate both deficient perfor-mance and prejudice. *Id.* (citation omitted).

We consider the following questions to determine whether the presumption of competence has been overcome: (1) if appellant's allegations are true, is there a reasonable explanation for counsel's actions; (2) if appellant's allega-tions are true, did defense counsel's level of advocacy fall measurably below

---

[19] U.S. CONST. amend. VI.

the performance ordinarily expected of fallible lawyers; and (3) if defense counsel was ineffective, is there a reasonable probability that, absent the errors, there would have been a different result. *Gooch*, 69 M.J. at 362; *United States v. Polk*, 32 M.J. 150, 153 (C.M.A. 1991) (citations omitted). Considering the last question, "[i]t is not enough to show that the errors had some conceivable effect on the outcome," instead it must be a "probability sufficient to undermine confidence in the outcome," including "a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Datavs*, 71 M.J. at 424 (internal quotation marks and citations omitted).

### 2. Analysis

In response to Appellant's assignment of error, we ordered and received declarations from both trial defense counsel—Appellant's civilian defense counsel and his area defense counsel. Considering these declarations along with the assertions Appellant makes in his assignment of error, we conclude that Appellant has not overcome the presumption of competence of his trial defense counsel.[20] We examine each allegation in turn.

#### a. Motion to Suppress

Appellant claims his counsel were deficient in failing to move to suppress his statements to his first sergeant, and he was prejudiced because his statements corroborated the video showing Appellant kissed MT. Civilian defense counsel explained this was not a failure, but "a strategic and tactical choice." On balance, they determined the statements were more helpful than harmful for three primary reasons. First, one statement was exculpatory to the penetrative offense, of which Appellant was ultimately acquitted. Second, a motion to suppress was unlikely to be successful, and if it were, the part of the statement before the rights advisement was "the most exculpatory evidence in the case." Third, Appellant's statement to his first sergeant was largely consistent with his later statement to AFOSI agents after a proper rights advisement. If the Government did not introduce at least one of those statements, both of which included exculpatory statements, Appellant would have had increased pressure to testify and "[l]anguage barriers weighed against" him testifying. Finally, in the words of the civilian defense counsel, they chose not to "risk losing Specification 1 of the Charge [alleging sexual assault] in order to obtain

---

[20] We considered the declarations to resolve this issue pursuant to *United States v. Jessie*, 79 M.J. 437, 442 (C.A.A.F. 2020) (observing a Court of Criminal Appeals is allowed to accept affidavits "when necessary for resolving claims of ineffective assistance of trial defense counsel . . . when those claims and issues are raised by the record but are not fully resolvable by the materials in the record"). Our consideration is limited to determining whether a factfinding hearing or other appellate relief is warranted. *United States v. Ginn*, 47 M.J. 236, 238 (C.A.A.F. 1997) (citations omitted).

an unlikely acquittal on the Additional Charge of a kiss that was recorded and that Appellant said was consensual." We find counsel's explanations objectively reasonable, and that Appellant has not met his burden to demonstrate sub-standard performance of his counsel. Thus, we determine that counsel were not deficient in refraining from filing a motion to suppress Appellant's statements to his first sergeant.

### b. Cross-examination of MT

Appellant next claims his trial defense counsel should have more thoroughly explored MT's motive to lie or misrepresent and developed MT's prior inconsistent statements. The trial defense counsel explained that their strategy for the cross-examination of MT was to focus on her lack of recollection—that "she was confused and not lying." Such is clear from the record, for example, when civilian defense counsel previewed to the members he would act "gentlemen like" with the witnesses. By the closing argument, however, he argued that perhaps MT's inconsistencies were due to "self-preservation of self-identity"—that she was lying to herself.

Civilian defense counsel added that their strategy regarding Specification 2 of the Charge (alleging touching MT's stomach) was not focused on MT's testimony about whether the act occurred, but the lack of intent to gratify sexual desire. He explained: "[t]he fact that she vomited was arguably the best evidence that he lacked the intent to gratify his sexual desire when he was in the bed." That is, instead of painting MT as a liar, the defense strategy was to posit that MT vomiting before the alleged stomach touch would negate any sexual desire on Appellant's part. Appellant counters that this strategy was faulty because intent to gratify could be inferred based on the surrounding circumstances, and the evidence indicating a touch on the stomach was limited to MT's memory. However, in cross-examination of MT, civilian defense counsel did show MT's memory was limited. The following is illustrative: after ascertaining MT did not see the touching, civilian defense counsel asked her, "And you don't have any memory of being stroked or caressed or touched or some movement of whatever was touching your stomach, right?" to which MT replied, "I can't remember." Appellant's trial defense counsel's initial strategy of focusing on lack of intent, and additional strategy of lack of memory both were reasonable. Appellant has not shown that his counsel were deficient.

### c. Instructions and Argument on Bodily Harm

Next, Appellant extends his argument regarding the theory of liability for the Specification of the Additional Charge (alleging a kiss), claiming his counsel were ineffective for failing to object to the military judge's instructions regarding bodily harm and incapacity to consent. We disagree. The competence of the victim to consent is relevant to whether Appellant caused "bodily

harm."[21] The military judge's instructions on these points were accurate statements of the law and were not confusing. We find counsel's lack of objection was not deficient performance.

### d. Discovery Request

Appellant claims his trial defense counsel failed to submit a timely and thorough discovery request, resulting in a failure "to exercise due diligence to completely defend Appellant," who was prejudiced because "it is likely that they would have received additional evidence helpful to Appellant's defense." Appellant's area defense counsel disagreed, asserting he "submitted a timely and comprehensive discovery request," which he attached to his declaration. Appellant's civilian defense counsel stated, "We received everything we needed," and noted Appellant has not identified what they allegedly failed to obtain.

After he was detailed post-referral to defend Appellant, the area defense counsel was unsure whether Appellant's civilian defense counsel or his previous area defense counsel had submitted a discovery request, so for "clarity and efficiency" he requested discovery over email, which included "all discovery categories that were relevant to the case." Among the categories he requested were "any relevant personnel, medical, and mental health records" and "documents and information concerning any reassignment or 'expedited transfer' of the complaining witness," "any document used by a witness to prepare for trial," and items including "documents, photographs, tangible objects . . . obtained from or [which] belong to [Appellant]."

Appellant avers

> [D]iscovery requests typically include multiple pages of numerous items including: (1) any evidence to diminish the credibility of the complaining witness or other potential witnesses including derogatory data, adverse administrative actions, or information contained on social media; (2) information from the AFOSI investigation outside of the ROI including agent notes, internal data pages, interview logs, evidence of adverse actions taken against any of the agents involved; (3) any handwritten,

---

[21] We echo a previous decision from this court, which considered a conviction for sexual assault by bodily harm: "The extent to which [the victim] was intoxicated or was asleep at the time [the a]ppellant committed the sexual act were part of the 'surrounding circumstances' that were 'to be considered in determining whether [the victim] gave consent,' in accordance with Article 120, UCMJ." *United States v. Campbell*, No. ACM 38875 (reh), 2021 CCA LEXIS 170, at *35 (A.F. Ct. Crim. App. 10 Feb. 2021) (unpub. op.) (citing *MCM*, pt. IV, ¶ 45.a.(g)(8)(C)).

> typed or recorded statements by potential witnesses; (4) disclosure of evidence seized from the accused; and so on.

We find the area defense counsel's abbreviated request sufficiently addressed these items. As to (1), the Government is required to provide such information even in the absence of a defense request. R.C.M. 701(a)(6)(D). Item (2) is fairly included in the request for documents a witness used to prepare for trial as well as the Government's obligation to provide information affecting the credibility of its witnesses. The area defense counsel's request also fairly included items (3) and (4).

The only specific "additional evidence" Appellant cited that he would have received had his trial defense team submitted a more lengthy discovery request related to two matters the Defense identified in its post-trial motion for appropriate relief: MT's complaint about another male Airman from her dorm in 2017 and her resulting move to a different dorm room, and MT's interactions with a paralegal from the prosecuting base legal office both before and after the alleged offenses. The military judge held a post-trial Article 39(a), UCMJ, hearing, at which the parties presented evidence and argument regarding the defense request to dismiss the case with prejudice or, if not, order a new trial. The Government submitted overwhelming evidence that neither investigators nor legal office personnel—save the paralegal—knew about the 2017 complaint. Additionally, the Government argued that information about MT and the paralegal would not be responsive to a general defense discovery request, they were not required affirmatively to provide the Defense the information, and the paralegal's relationship with MT was in the AFOSI ROI.[22]

A lengthy but general discovery request likely would not have resulted in the Defense receiving additional information about the paralegal's relationship with MT from the Government. Moreover, the Government did not consider "moving dorm rooms" as a reassignment responsive to the Defense request in discovery about "any reassignment or 'expedited transfer;'" telling the military judge during the post-trial hearing, "That is not at all something that the [G]overnment was oriented to." Appellant has not identified what his trial defense team specifically failed to do that would have prompted the Government to provide this information through discovery. Appellant has not shown that the typical defense discovery request would encompass complaints MT made about others in the dorm or the finer details of MT's relationship with a member of the legal office. Finally, we agree with the military judge that "there is

---

[22] The trial defense team had received agent notes before trial, to include notes of the interview with the paralegal indicating she was acquainted with MT. The Defense submitted the notes as Appellate Exhibit XLIV in support of its post-trial motion.

virtually no probative value to the evidence and it would not have been admitted at trial." Thus, we conclude the trial defense counsel were not ineffective in its requests for discovery.

### e. Appellant's Unsworn Statement in Sentencing

Appellant asserts his trial defense counsel were ineffective "for failing to include relevant collateral consequences in his unsworn statement," including sex-offender registration, consequences of a federal conviction, and mandatory administrative discharge processing. We disagree. "The collateral consequences of a court-martial do not constitute R.C.M. 1001 material, and while they may be referenced in an unsworn statement, . . . they should not be considered for sentencing." *United States v. Talkington*, 73 M.J. 212, 216 (C.A.A.F. 2014) (citations omitted). Trial defense counsel had no duty to inform the members of matters that are an improper consideration for sentencing, much less do so through their client's unsworn statement. *See id.* (addressing a military judge's instruction regarding an appellant's unsworn statement and observing that the proper focus of sentencing is on the offense and the character of the accused, and "to prevent the waters of the military sentencing process from being muddied by an unending catalogue of administrative information" (internal quotation marks omitted) (quoting *United States v. Rosato*, 32 M.J. 93, 96 (C.M.A. 1991))).

Moreover, Appellant did not aver that his trial defense counsel failed to inform him of sex-offender registration requirements so that he could address the matter in his unsworn statement.[23] Appellant submitted no declaration; he did not allege he wanted to speak to sex-offender registration but was counseled against it. The owner of an accused's unsworn statement is that accused. *See United States v. Marcum*, 60 M.J. 198, 209 (C.A.A.F. 2004) ("[T]he right to make the unsworn statement is personal to the accused."). On these facts, we will not find a defense counsel ineffective for what an accused chooses to say to the sentencing authority.

While Appellant did not specifically mention sex-offender registration or other consequences that might flow from his conviction, the area defense counsel argued to the members that Appellant "is now a federal convict for the rest of his life, of a sexual assault offense under Article 120." This oblique reference to the lifetime consequence of a sexual assault conviction may have been the

---

[23] Similarly, Appellant does not claim that he did not know about the change in the law of abusive sexual contact, or that he wanted to address the topic in his unsworn statement.

trigger for the members to ask the military judge "what is the impact to [Appellant] as a federal convict" and "will he have to register as a sex offender."[24] We find counsel's performance was not deficient.

Accordingly, the trial defense counsels' actions were reasonable and their performance was not measurably below professional standards. As such, we need not reach the question of whether there was a reasonable probability of a different result.

### E. Improper Argument

Appellant contends the trial counsel committed prosecutorial misconduct when stating that they represented "the pursuit of justice" and argued that justice would only be served if Appellant was convicted and adjudged a sufficient punishment. We have considered the prosecutors' statements and arguments and find error.

#### 1. Additional Background

The circuit trial counsel introduced himself and his co-counsel before questioning the court members. He stated,

> My name is [ ]. I'm the circuit trial counsel and I'm stationed at Langley Air Force Base. I am TDY here to represent the United States of America in the pursuit of justice in this case. I'm assisted today with Lieutenant [ ], he is stationed here at Hanscom. We will be dividing up tasks throughout this trial, and he is what we call the assistant trial counsel.

After voir dire, the number of enlisted court members fell below the minimum ratio of one-third of the panel, *see* R.C.M. 503(a)(2), and the convening authority detailed additional enlisted court members. Before questioning those members, the circuit trial counsel introduced himself and his co-counsel using words very similar as before, including, "I'm stationed at Langley Air Force Base, Virginia, and I'm TDY here to represent the United States of America in the pursuit of justice in this case."

---

[24] Appellant does not assert, nor do we find, plain error when, in response to these questions, the military judge provided answers and instructions in line with *Talkington*, to which the Defense indicated it had no objection, questions, or concerns, thus waiving the issue. *See United States v. Davis*, 79 M.J. 329, 331 (C.A.A.F. 2020) (conceding to an instruction constitutes waiver), *cert. denied*, 141 S. Ct. 355 (2020). We also decline to speculate whether counsel were ineffective when they did not request the military judge instruct on issues collateral to the matters the members were charged with deciding.

The assistant trial counsel gave the Government's opening statement to the court members. He ended with these words,

> Members, I will leave you with this: it's your job to listen to both sides and review all the evidence in this case. And after the fact—I should say one more thing. After all of this happened, you will be able to see text messages between the accused and between [MT], where [Appellant] is essentially pleading for forgiveness. And I want to quote one of those text messages. "You please repair the little that can be repaired."

> Now I ask you all to repair the little that can be repaired and bring justice to [MT] by finding [Appellant] guilty of all charges and specifications that he faces today.

At the beginning of his argument to the court members on findings, circuit trial counsel revisited the concept of justice he brought up in voir dire, stating,

> Good morning. I feel like it's been months since I first spoke with you during *voir dire*. And as I go through my argument today, this will be the last time that I speak with [sic] before this trial becomes yours. Our duties will be over and your duties will begin. And you will have the ultimate decision on what happened in this case and whether justice will be served, or whether [Appellant] will be acquitted.

> A tremendous responsibility. One that is not easy and one that I'm going to attempt to help out with today. There was a lot of law that you just received from the military judge, it's about 17 pages or so. You'll get it after we finish with closing arguments.

As he was arguing why the members should find Appellant guilty of sexual assault, he stated,

> We talked about this in *voir dire*. The government has no obligation to prove its case with 100 percent mathematical certainty. The world doesn't work like that. If that were the standard, there would be no justice. The standard is proof beyond a reasonable doubt. So any doubts have to be reasonable. They have to be real; real possibilities.

While the civilian defense counsel did not object during the circuit trial counsel's argument, he began his closing argument by addressing the standard of reasonable doubt, then countering the argument about justice:

> If you think there's a real possibility that he's not guilty, you must give him the benefit of the doubt and find him not guilty.

Why am I repeating that? Because it's more important than ever. Because I sat there at the table and I listened to the prosecutor at the beginning of his closing statement utter words that should never come out of a prosecutor's mouth. He gave you a false choice. He said "You can render justice and find him guilty, or you can find him not guilty."

It's a false choice. We all swore to defend the Constitution of the United States. And if you think there's a real possibility that he's not guilty, you give him the benefit of the doubt and you find him not guilty. And that is justice. Those are words that should never come out of a prosecutor's mouth.

Civilian defense counsel also argued:

Because what I have here is a complainant that has no memory of a penetrative act, right? I have a client who says that there was no penetrative act, right? And I have some monumental problems with the DNA evidence. This is a search for truth. We're all—this false choice that the prosecutor gives you, is absolutely a false choice. We're all in this together. We have different jobs to do, but it's still a search for truth.

Civilian defense counsel also ended his argument with the theme of reasonable doubt and justice:

So, members of the panel, what the government has given you is a false choice. If you think there's a real possibility that he's not guilty, you must give him the benefit of the doubt. . . . And it would be a serious injustice, miscarriage of justice, if this case is decided wrongly.

Circuit trial counsel responded directly, beginning his rebuttal argument,

It's not a false choice. It's a simple choice: guilty or not guilty. And that decision has to be based upon the evidence and the law. And when that decision is made, that's what we call justice. And the evidence in this case supports guilt beyond a reasonable doubt. That's not a false choice. That is justice. And that is what the evidence requires you to do in this case.

The court members acquitted Appellant of the sexual assault specification, and convicted him of the two abusive sexual contact specifications. In his sentencing argument, the assistant trial counsel continued the "justice" theme from his opening statement:

Now I know it has been a long week for everybody. But if you could go back to when I first spoke with you all, days ago, I stood

> up here. I said you all had a duty, you all had a responsibility to find justice in this case. And there is no justice without an appropriate punishment. Now it's my job, and it's my duty, and I should add, one that I hold in the highest regard, to explain to you trial counsel's sentence recommendation.

And he ended his argument with the justice theme:

> Members, I submit to you now to make the determination for a fair and just sentence. A sufficient punishment that will bring justice here to this case, and that will bring some form of closure to [MT] for all that she has to have had endured in this year-and-a-half nightmare.

No party requested, and the military judge did not give *sua sponte*, any specific instruction to the members about the Government's theme of justice. The military judge did provide standard—and accurate—instructions on the burden of proof. Just before closing arguments, the military judge provided instructions as required by R.C.M. 920(e)(1)–(5), including the presumption of innocence, the Government's burden of proof beyond a reasonable doubt, and to consider "only matters properly before the court as a whole." Immediately after the Government's rebuttal argument, the military judge provided a standard instruction to the members, stating, "If there is any inconsistency between what counsel have said about the instructions and the instructions which I gave you, you must accept my statement as being correct." The military judge also advised the members that "arguments of trial counsel and his recommendations are only his individual suggestions, and may not be considered as the recommendation or opinion of anyone other than such counsel."

**2. Law**

"Prosecutorial misconduct can be generally defined as action or inaction by a prosecutor in violation of some legal norm or standard, e.g., a constitutional provision, a statute, a Manual rule, or an applicable professional ethics canon." *United States v. Meek*, 44 M.J. 1, 5 (C.A.A.F. 1996) (citation omitted). A prosecutor's interest "in a criminal prosecution is not that it shall win a case, but that justice shall be done." *United States v. Fletcher*, 62 M.J. 175, 179 (C.A.A.F. 2005) (quoting *Berger v. United States*, 295 U.S. 78, 88 (1935)).

We review prosecutorial misconduct and improper argument de novo. *United States v. Voorhees*, 79 M.J. 5, 9 (C.A.A.F. 2019) (citation omitted), *cert. denied*, 140 S. Ct. 2566 (2020). When no objection is made at trial, we review for plain error. *United States v. Andrews*, 77 M.J. 393, 398 (C.A.A.F. 2018) (citations omitted). "Plain error occurs when (1) there is error, (2) the error is plain or obvious, and (3) the error results in material prejudice to a substantial right of the accused." *Id*. at 401 (quoting *Fletcher*, 62 M.J. at 179). We do not

review counsel's words in isolation; we review the argument in context of the entire court-martial. *United States v. Baer*, 53 M.J. 235, 238 (C.A.A.F. 2000) (citations omitted).

If we find a prosecutor's argument "amounted to clear, obvious error," we then determine "whether there was a reasonable probability that, but for the error, the outcome of the proceeding would have been different." *Voorhees*, 79 M.J. at 9 (citations and internal quotations marks omitted). "For constitutional errors, rather than the probability that the outcome would have been different, courts must be confident that there was *no reasonable probability* that the error *might have contributed* to the conviction." *United States v. Tovarchavez*, 78 M.J. 458, 462 n. 5 (C.A.A.F. 2019) (emphasis in original) (citing *Chapman v. California*, 386 U.S. 18, 24 (1967)). That is, "where a forfeited constitutional error was clear or obvious, 'material prejudice' is assessed using the 'harmless beyond a reasonable doubt' standard set out in *Chapman.*" *Id*. at 460 (quoting *United States v. Jones*, 78 M.J. 37, 45 (C.A.A.F. 2018)). In analyzing prejudice from a prosecutor's improper argument, we consider: "(1) the severity of the misconduct, (2) the measures adopted to cure the misconduct, and (3) the weight of the evidence supporting the conviction." *Andrews*, 77 M.J. at 402 (quoting *Fletcher*, 62 M.J. at 184).

The burden of proof at a court-martial is of a constitutional magnitude. *See United States v. Hills*, 75 M.J. 350, 357 (C.A.A.F. 2016). "Lest there remain any doubt about the constitutional stature of the reasonable-doubt standard, we explicitly hold that the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970).

It is inappropriate for counsel to reference "the jury's societal obligation . . . if it suggests the panel base its decision on the impact of the verdict on society, a victim, and the criminal justice system as a whole, rather than the facts of the case." *United States v. Condon*, No. ACM 38765, 2017 CCA LEXIS 187, at \*53 (A.F. Ct. Crim. App. 10 Mar. 2017) (unpub. op.), *aff'd*, 77 M.J. 244 (C.A.A.F. 2018).

In *United States v. Schroeder*, 65 M.J. 49 (C.A.A.F. 2007), the United States Court of Appeals for the Armed Forces (CAAF) considered the propriety of the prosecutor's closing argument pleading for justice for victims of charged and uncharged misconduct introduced under Mil. R. Evid. 414. "Trial counsels' presentation invited members to convict and punish [the a]ppellant for his uncharged misconduct, as opposed to using that misconduct to inform their judgments regarding the charged conduct. The error was also plain and obvious." *Schroeder*, 65 M.J. at 58. After considering the factors in *Fletcher*, the CAAF

found no plain error, noting that "[i]mproper argument does not require reversal unless 'the trial counsel's comments, taken as a whole, were so damaging that we cannot be confident that the members convicted the appellant on the basis of the evidence alone.'" *Id*. at 58–59 (quoting *Fletcher*, 62 M.J. at 184).

### 3. Analysis

We find two statements were obvious error: (1) the assistant trial counsel's opening statement asking the court members to "bring justice to [MT] by finding [Appellant] guilty of all charges and specifications that he faces today," and (2) the circuit trial counsel's comment in argument to the court members that their duty was to decide "whether justice will be served, or whether [Appellant] will be acquitted." We find no prejudicial error in assistant trial counsel's statements in sentencing. We consider the totality of the prosecutors' statements from voir dire through closing arguments.

In voir dire, circuit trial counsel told the court members he was "represent[ing] the United States of America in the pursuit of justice;" he had not yet explained what "justice" meant. Next, in opening statement the assistant trial counsel asked the court members to "bring justice to [MT] by finding [Appellant] guilty." That is a plea for a finding based on the interests of a victim, and not on the evidence. *See Condon*, unpub. op. at *53. In closing argument, circuit trial counsel reminded the members he spoke to them in voir dire. He then told them they "have the ultimate decision on what happened in this case and whether justice will be served, or whether [Appellant] will be acquitted." In a similar vein, he explained the Prosecution's burden of proof was not "100 percent mathematical certainty" because "[i]f that were the standard, there would be no justice." Put together, the messages the prosecutors sent the court members were that the Prosecution seeks justice for the alleged victim, and justice can only mean a conviction.

Civilian defense counsel interpreted the prosecutor's argument as a comment on the burden of proof; that is, the prosecutor asked the court members to find Appellant guilty because that is what "justice" requires, as opposed to a finding based on proof beyond a reasonable doubt. The risk of equating "justice" with "criminal conviction" is the members would disregard the presumption of innocence and apply the wrong standard of proof.[25]

---

[25] We note this issue is comparable to, but distinguishable from, *United States v. Hills*, in which the CAAF found the military judge's instructions on the standard of proof "muddled" and implicated the Due Process Clause (U.S. CONST. amend. V.) "by creating the risk that the members would apply an impermissibly low standard of proof,

We next consider whether this obvious error resulted in material prejudice to a substantial right. First, the misconduct was moderately severe. It was a misstatement of the law, including the duties of the prosecutor and the court members. The statements that "there would be no justice" if the standard were "100 percent mathematical certainty" was presented during the portion of the argument about sexual assault, of which offense the members found Appellant not guilty. The circuit trial counsel did not end his argument with this theme; he ended with a summary of the evidence. The statements did not introduce facts not in evidence or have the tendency to inflame the passions of the court members. The reference to justice for victims was not repeated from opening statement to closing argument.

Failure to object is "some measure of the minimal impact of [the] prosecutor's improper argument." *Gilley*, 56 M.J. at 123 (internal quotation marks and citation omitted). However, counsel may have a tactical reason for not objecting, *see Voorhees*, 79 M.J. at 13, and may choose to address even a significant impropriety without involving the military judge.[26]

Like in *Voorhees*, in this case civilian defense counsel allowed trial counsel's improper argument to continue, then addressed it in the beginning of his closing argument to the members. *See id*. Several times he explained the correct burden of proof and that choosing justice or acquittal was "a false choice." While in his rebuttal argument the circuit trial counsel did not retract his earlier statements, he correctly explained both "justice" and the Government's burden. The military judge provided correct instructions before and after closing arguments regarding the burden of proof, the presumption of innocence, and making findings based on the evidence. In all, several measures were taken to cure the misconduct. Such measures can be sufficient to find the erroneous statements harmless beyond a reasonable doubt. *Cf. United States v. Mason*, 59 M.J. 416, 425 (C.A.A.F. 2004) (finding error harmless beyond a reasonable doubt where the military judge overruled a defense objection to the DNA expert

---

undermining both 'the presumption of innocence and the requirement that the prosecution prove guilt beyond a reasonable doubt.'" 75 M.J. 350, 357 (C.A.A.F. 2016) (citation omitted). However, in *Hills* the error was in the military judge's instructions to the members, not prosecutors' statements.

[26] If the defense objection is sustained and the military judge provides the court members an appropriate instruction, the defense counsel may be precluded from addressing the same matter in his argument. A reasonable tactic, therefore, would be for counsel to refrain from objecting, then address the matter freely during counsel's own argument.

testifying about whether the defense had requested evidence be retested, because of the trial counsel's correct reiteration in argument about which party had the burden of proof, as well as the military judge's standard instruction that the burden never shifts from the Government).

The weight of the evidence supporting the convictions, as noted in our discussion of legal and factual sufficiency, was moderate. We disagree with Appellant that he "had a strong case for reasonable mistake of fact as to consent" and that MT's testimony "was riddled with inconsistencies."[27]

Appellant does not assert that the prosecutors' improper arguments were of a constitutional dimension. Nevertheless, such an analysis is required inasmuch as the prosecutors' argument for "justice" can be interpreted as arguments to reduce the Government's burden of proof to something lower than proof beyond a reasonable doubt based upon the evidence and to disregard the presumption of innocence. *See Hills*, 75 M.J. at 357. To find such an error harmless beyond a reasonable doubt, we must be confident that there was no reasonable probability that the error might have contributed to the conviction.

We are not convinced the court members erroneously believed the standard of proof was less than beyond a reasonable doubt, or that Appellant was not presumed innocent, or that they could convict based on something other than the evidence presented. We recognize that, absent evidence to the contrary, we may "presume that members follow a military judge's instructions." *United States v. Taylor*, 53 M.J. 195, 198 (C.A.A.F. 2000) (citations omitted). If the court members misinterpreted the circuit trial counsel's statement of the law as correct, and disregarded what the military judge and even the civilian defense counsel told them, he left them with this: "It's a simple choice: guilty or not guilty. And that decision has to be based upon the evidence and the law. And when that decision is made, that's what we call justice." We are satisfied beyond a reasonable doubt that the prosecutors' statements did not result in unjust convictions.

A prosecutor may argue that justice is required. However, a prosecutor should be careful not to confuse the jury by conflating "justice" and "criminal conviction." "Justice" must be tethered to the evidence and the burden of proof

---

[27] We note it would not be helpful to compare the strength of the evidence supporting the allegation of sexual assault of which Appellant was acquitted, including MT's testimony. The record indicates Appellant was charged with committing an act while MT was incapacitated by alcohol, but the evidence supported a finding that MT instead was asleep, a point civilian defense counsel returned to more than once during his closing argument.

lest it be confused with justice for the victim or society or the military justice system.

## III. CONCLUSION

The findings and sentence entered are correct in law and fact, and no error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(d), UCMJ, 10 U.S.C. §§ 859(a), 866(d). Accordingly, the findings and sentence are **AFFIRMED**.

MEGINLEY, Judge, (dissenting in part and in the result):

I agree with the court's decision to affirm the finding of guilty as to the Additional Charge and its specification, alleging Appellant made sexual contact upon MT by kissing her mouth, but for different reasons. However, I respectfully cannot agree with the court's decision to affirm the finding of guilty to Specification 2 of the Charge, which alleged that Appellant made sexual contact upon MT by touching her stomach with his hand. I would find this specification legally and factually insufficient, failing to meet the element that Appellant intended to gratify his sexual desire by touching MT's stomach, and would set aside Appellant's adjudged punishment of a bad-conduct discharge. Further, I find there was ineffective assistance of counsel and that trial counsel committed prosecutorial misconduct during their arguments.

## A. Legal and Factual Sufficiency of Appellant Touching MT's Stomach

As the majority notes in its opinion, the elements of Specification 2 of the Charge alleging abusive sexual contact in violation of Article 120, UCMJ, 10 U.S.C. § 920, for which Appellant was convicted include: (1) that Appellant committed a sexual contact upon MT by touching MT's stomach with his hand; (2) that MT was incapable of consenting to the sexual contact due to impairment by alcohol; (3) that Appellant knew or reasonably should have known of MT's impairment; and (4) that Appellant did so with the intent to gratify his sexual desire. *See Manual for Courts-Martial* (2016 ed.) (2016 *MCM*), pt. IV, ¶ 45.b.(8)(f).

### 1. MT's testimony

The only evidence regarding the touching comes exclusively from MT's in-court testimony, which was relatively brief, and from statements she made initially to the Sexual Assault Nurse Examiner (SANE). In court, MT testified she went to the bathroom and saw Appellant. She then provided the following further responses,

> A [MT]. I did what I had to do. And then I went over to the bed and I la[y] down.

Q [Trial Counsel]. Now as you're going to your bed to l[ie] down, do you see him anywhere?

A. I didn't see him l[ ]ying down in the bed. I did not -- if I would have seen him, I would have, of course, I would have done something. I would have --

Q. Did you see him –

A. -- I would have reacted.

Q. Did you see him anywhere in the room?

A. I remember I . . . walked out of the restroom, and I la[y] down. That's what I remember.

Q. And let's be honest, what is your memory like at this point?

A. I wasn't able to remember that much, so . . . .

Shortly thereafter, trial counsel asked MT the following questions:

Q. Let me ask you this: put yourself, as hard as it is, back in that moment, when you're l[ ]ying in your bed the morning of the 27th. What's the last thing you remember feeling? And I know it may be hazy. What is that?

A. Feeling touched. Uh-huh.

Q. Any ability to say where?

A. My stomach. It was very, very blurry.

Q. Hard to remember, is that right?

A. It's hard to remember, yes.

Q. It's a long time ago?

A. Yes.

Q. You were very intoxicated, is that right?

A. Yes.

On cross-examination, civilian defense counsel had the following exchange with MT:

Q [Civilian Defense Counsel]. There was one other point. And I would be remiss if I didn't talk about it. That last memory that you had was laying in the bed, right?

A [MT]. Yes, sir.

Q. And your testimony on direct examination was that you felt as though you were being touched on your stomach, right?

A. Yes, sir.

Q. But you didn't open your eyes and look, right?

A. No, sir.

Q. There was no rubbing?

A. I can't remember right now.

Q. There was no stroking or caressing of your stomach?

A. I can't remember, sir.

Q. You just felt as though something was touching your stomach, and you don't have any memory of actually seeing or knowing what it was, right?

A. I -- I'm just -- I'm telling you what I remember now.

Q. Right.

A. So, yes.

Q. Right. But you don't have any memory of physically opening your eyes and visually looking --

A. No, sir.

Q. And you don't have any memory of being stroked or caressed or touched or some movement of whatever was touching your stomach, right?

A. I can't remember.

This was the extent of the questioning and testimony of MT on this issue. At no point did MT state that Appellant touched her stomach *with his hand*. Besides "[f]eeling touched" on her stomach, the only other evidence provided was that MT told the SANE that she went to the bathroom, then lay in bed, and after she lay down, that is when Appellant touched her body over her clothing. More problematic for the Government, even if one reads into MT's testimony that Appellant did in fact touch her stomach with his hand, I find there was nothing in the testimony above to infer Appellant did so with the intent to gratify his sexual desire. Assuming Appellant did in fact touch her, MT did not tell the court where on her stomach Appellant allegedly touched her, with what (hand, finger, or object), how long he may have touched her, or whether he touched her over or under her clothing. There is no detail or context to her testimony.

### 2. Evidence from the Additional Charge

While MT's testimony raises issues as to the legal and factual sufficiency of the stomach touch allegation, the video of the kiss puts MT's testimony as

to the stomach touch in perspective.[1] The majority accurately describes Appellant's actions leading up to, and after the kiss, as the video shows MT intoxicated, to the point she has trouble walking, and actually falls down. Despite the glaring fact that the kiss happens quickly, and is quite literally a "peck" on what appears to be her mouth (if one were to blink, it could be missed), a rational factfinder could conclude MT could not consent to being kissed.

MT's state of intoxication and the genesis of the kiss offense as an additional charge is significant and needs to be placed in context with her testimony. The kiss incident appears to first come up during the Article 32, UCMJ, 10 U.S.C. § 832, hearing, and was only referred as an additional charge when requested by MT's special victims' counsel (SVC) and with the approval of MT (according to her SVC). Prior to trial, MT never stated Appellant kissed her, never told Air Force Office of Special Investigation (AFOSI) agents about the kiss, and never told the SANE she was kissed. For the first time on the witness stand, nearly 18 months after the incident, MT "start[ed] to refresh [her] memory," and only then, did MT remember Appellant kissing her. In other words, despite the fact that there was a video of the incident, the Government referred an additional charge and specification that its own victim, apparently, knew little, if anything, about. The addition of the charge appears to have been nothing more than an afterthought or an attempt by the Government to shore up what was already a fragile case. After review of the video, MT's testimony on remembering a kiss, for the first time on the witness stand, 18 months after the fact, indicates significant recollection abilities, and exposed credibility and believability problems on her part related to the stomach touch, and to the case as a whole. Therefore, because of MT's credibility issues relating to the kiss, I find this evidence contributes to my finding that the touching offense is legally and factually insufficient.

### 3. Evidence from Appellant

There was additional evidence introduced at trial on the issue of Appellant touching MT, as the Government called Appellant's first sergeant to testify that Appellant called him the same day as the incident and told him what happened. Appellant stated he was "hanging out with a female friend the night before,"

> And as the night progressed, I think she had some trouble going back to her room. And so [Appellant] helped her back to her room. And when he got in there he mentioned that he went into

---

[1] Based on the videotape evidence, I concur with the majority that the Additional Charge and its specification related to Appellant kissing MT is legally and factually sufficient.

> the dorm room bathroom -- because there's two rooms that share a bathroom -- he went in there to lock the suite-mate's door, so that way the suite-mate wouldn't come in.
>
> And then he mentioned that she went in there and threw up. So he started helping her clean up that vomit, [and] stayed back. When she went back to her bed and fell asleep, he finished cleaning up the vomit, and then went into bed with her and went to sleep.

Appellant also told his first sergeant MT threw up a second time, and he cleaned that vomit up as well. While some would view Appellant's statement as self-serving and question his credibility, there was evidence corroborating Appellant's statement to his first sergeant. Despite MT's testimony that she threw up later that day after the alleged incident (and not right before she went to bed), AFOSI agents found vomit on MT's floor (using a black light), possible vomit stains on MT's blanket, and her nightstand. If Appellant did in fact touch her stomach, the evidence suggests it probably occurred in a fairly narrow timeframe at or around the time he told his first sergeant he was cleaning up vomit. Civilian defense counsel told the members during closing, "[t]he fact that she vomited was arguably the best evidence that he lacked the intent to gratify his sexual desire when he was in the bed." I agree. There was unconvincing evidence that Appellant touched MT's stomach with the intent to gratify his sexual desire.

### 4. Conclusion and Sentence Reassessment

The majority finds ample circumstantial evidence to support the conviction of the stomach touch, highlighting that Appellant touched MT's legs hours earlier, the kiss in the hallway, his statement that he intended to have sex with MT ("but as soon as [she] passed out, I said no,"), and the fact that Appellant slept in MT's bed wearing only his underwear. My esteemed colleagues also note that Appellant's DNA was found on MT's underwear.[2] On its face, these facts are not favorable to Appellant.

---

[2] It is important to qualify the DNA evidence in this case. The inside crotch area of the underwear the Appellant and MT each was wearing, as well as MT's shorts, was analyzed for DNA. The examination identified Appellant's DNA on MT's underwear and shorts, and MT's DNA on Appellant's underwear. In response to the court-martial's question about the amount of male and female DNA in the underwear, the parties stipulated to an answer: "MT's underwear contained 1,034.18 nanograms of DNA, and of that total, the amount that was male was 0.57 nanograms (with a trace amount of

However, these facts are spread out over hours, and the only fact of substance regarding this allegation related to MT's stomach (other than Appellant touched MT) is that Appellant apparently touched MT's stomach after she went to the bathroom or threw up. After weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, I am not convinced the Government proved the element that Appellant touched MT to gratify his sexual desire beyond a reasonable doubt. Other than when Appellant allegedly touched MT on her stomach, she provided no details as to the touching and her testimony was nothing more than a series of "I don't remember[s]." Just because Appellant's DNA was found in MT's underwear does not mean it is a reasonable inference that Appellant also touched her stomach in a sexual or erogenous manner at the only time it could have occurred. As such, I find that the Government did not prove the element of intent to gratify sexual desire beyond a reasonable doubt. For these reasons, I find this specification to be legally and factually insufficient and would set aside the finding of guilty to Specification 2 of the Charge and dismiss it with prejudice.

In setting aside the stomach specification, I would evaluate whether to reassess Appellant's sentence. This court has "broad discretion" when reassessing sentences. *United States v. Winckelmann*, 73 M.J. 11, 12 (C.A.A.F. 2013). Our superior court has repeatedly held that if we "can determine to [our] satisfaction that, absent any error, the sentence adjudged would have been of at least a certain severity, then a sentence of that severity or less will be free of the prejudicial effects of error." *United States v. Sales*, 22 M.J. 305, 308 (C.A.A.F. 1986). This analysis is based on a totality of the circumstances with the following as illustrative factors: dramatic changes in the penalty landscape and exposure, the forum, whether the remaining offenses capture the gravamen of the criminal conduct, whether significant or aggravating circumstances

---

DNA attributed to a male other than [Appellant]); [Appellant]'s underwear contained 23.73 nanograms of DNA, and the amount that was MT's was 4.6 nanograms."

The government DNA expert opined the DNA source was from a biological fluid (based on the size and quantity of the DNA), but did not rule out the possibility of skin cells as the source of the DNA. The Government's DNA expert did not test for saliva, sweat, smegma, or urine. The defense DNA expert testified the DNA could come from either biological fluids or skin cells. Further, if the DNA was from a biological fluid, it was an uncontroverted fact that it was not semen, spermatozoa, or any seminal fluid, and there was no evidence it was vaginal fluid (nor was Appellant's underwear tested for vaginal fluid). USACIL had the technology to test for vaginal fluid, but did not. One flaw from the testimony of both experts was an explanation of what constitutes a nanogram. A nanogram is one billionth of a gram, which given the amounts provided, would have been an infinitesimal amount of DNA.

remain admissible and relevant, and whether the remaining offenses are the type that we as appellate judges have experience and familiarity with to reliably determine what sentence would have been imposed at trial. *Winckelmann*, 73 M.J. at 15–16. Applying these factors to this case, I am confident that reassessment is appropriate.

The penalty landscape in Appellant's case has changed. Setting aside the convictions for the touching of MT's stomach, the maximum confinement, which was 14 years, is reduced by seven years to a new maximum of seven years. The other sentence components are not changed. This reduction in solely the maximum confinement weighs in favor of reassessment. Reviewing the entire record, and taking into consideration Appellant would have a single conviction for a single kiss, I would disapprove Appellant's bad-conduct discharge.[3]

## B. Ineffective Assistance of Counsel

Appellant argues his counsel was ineffective in failing to present an effective sentencing case. I agree with Appellant, but for different reasons than his counsel have alleged.[4]

### 1. Amendments to Article 120, UCMJ

There is a conspicuous issue that needs to be addressed related to the charges of abusive sexual contact in this case. Had either the kiss or stomach touch allegations occurred after the implementation of the Military Justice Act of 2016 on 1 January 2019, neither the kiss nor the stomach touch would have been an abusive sexual contact crime under Article 120, UCMJ. This is because the law changed. Under the 2016 *MCM*, the definition of abusive sexual contact included the touching of any body part of any person. *See* 2016 *MCM*, pt. IV, ¶ 45.b.(8).[5] Congress removed this definition, *touching of any body part*, in the

---

[3] Appellant did not raise as an assignment of error "sentence appropriateness," nor did he raise an issue of cruel and unusual punishment for having to register as a sex offender for these offenses under the Eighth Amendment. U.S. CONST. amend. VIII. Appellant's convictions, along with the expansion of sex offender requirements since *United States v. Talkington*, 73 M.J. 212 (C.A.A.F. 2014) particularly within the Department of Defense, begs the question as to when do the collateral consequences of such convictions look more like a punishment. *See United States v. Diaz*, 967 F.3d 107, 111–12 (2d Cir. 2020) (Calabresi, J., concurring) (per curiam) (providing a judicial take on the negative effects of sex offender registration).

[4] I adopt the law cited by the majority opinion on ineffective assistance of counsel.

[5] Under the 2016 *MCM*, "sexual contact" means: "(A) touching, or causing another person to touch, either directly or through the clothing, the genitalia, anus, groin, breast,

National Defense Authorization Act for Fiscal Year 2017 (2017 NDAA), Pub. L. No. 114-328, § 5430, 130 Stat. 2000, 2929 (23 Dec. 2016). The Senate Report on the 2017 NDAA provides some insight on the removal of this language from the definition of "sexual contact." Although the report did not annotate any specific reasoning for the removal of this language, the report noted that "[t]he current definition of 'sexual act' under Articles 120 and 120b[, UCMJ,] is both overly broad (in that it captures non-sexual acts) and unduly narrow (in that it does not include all the prohibited acts involving children listed in section 2246(2)(D)) of title 18."[6] In light of this reasoning, specific body parts are now listed in the statute and "stomach" and "mouth" are not included.

The 2017 NDAA was enacted on 23 December 2016, and the amendments to the 2017 NDAA were to take effect on 1 January 2019. However, the President implemented guidance on the amendments in March 2018 through Executive Order 13,825, *2018 Amendments to the Manual for Courts-Martial, United States*, 83 Fed. Reg. 9889 (8 Mar. 2018), three-and-a-half months before Appellant committed his crimes. Unfortunately for Appellant, it took the President nearly 13 months after the NDAA was signed to issue executive guidance and another nine months to implement congressional intent. Again, the new definition of sexual contact does not list "mouth" or "stomach" as body parts that can be touched to gratify the sexual desire of a person. While the Government charged the stomach touch as part of the initial allegation when it preferred the case in March 2019, it added the kiss specification as a charge after MT's SVC requested the Government charge him with that offense at the Article 32, UCMJ, preliminary hearing; all charges, including the kiss specification, were referred to trial in May 2019—after the 2017 NDAA, the President's Executive Order, and implementation of the amended statute went into effect.

The change in the law as it relates to the charged offenses is important not just for the fact Appellant now has a conviction for touching MT's stomach and giving her a kiss; it is because Appellant, presumably, is now registered a sex offender. According to the Department of Defense Instruction (DoDI) 1325.07, *Administration of Military Correctional Facilities and Clemency and Parole*

---

inner thigh, or buttocks of any person, with an intent to abuse, humiliate, or degrade any person; or (B) any touching, or causing another person to touch, either directly or through the clothing, any body part of any person, if done with an intent to arouse or gratify the sexual desire of any person." Pt. IV, ¶ 45.a.(g)(2). All of section (B) was removed from the *Manual for Courts-Martial, United States* (2019 ed.). *See* 2019 *MCM*, pt. IV.

[6] S. REP. NO. 114-255, at 617 (2016).

*Authority* (11 Mar. 2013), the stomach touching charge is a registerable of-fense.[7] As this relates to Appellant's proceedings, had trial defense counsel ad-dressed this change in the law, at any point in the processing of this case, a different outcome very well may have occurred, and there is a possibility Ap-pellant's maximum confinement exposure would have been reduced, and more importantly, he could have possibly averted sex offender registration.[8]

## 2. Appellant's Unsworn Statement and Sex Offender Registration

---

[7] The stomach touching charge carries a Code 120-DF in the Defense Biometric Iden-tification System. *See* DoDI 1325.07, Table 6, at 84. DoDI 1325.07 makes it clear that Appellant will have to register as a sex offender:

> A Service member who is convicted in a general or special court-mar-tial of any of the offenses listed . . . , *must* register with the appropriate authorities in the jurisdiction . . . in which he or she will reside, work, or attend school, upon leaving confinement, or upon conviction if not confined.

DoDI 1325.07, App. 4 to encl. 2*,* ¶ 1, at 79 (emphasis added). Further, the DoDI states,

> A Service member convicted of any offenses listed . . . or convicted of offenses similar to those offenses listed . . . , shall be advised that the individual jurisdictions in which the offender might live, work, or at-tend school may require registration for offenses not listed . . . . Each registration jurisdiction sets its own sex offender policy and laws.

*Id.*, App. 4 to encl. 2, ¶ 3, at 79.

[8] The reasonableness of charging Appellant with these allegations is questionable. As stated in *United States v. Hurd*,

> [T]he Government has an inherent, almost-proprietary interest in doc-umenting a service member's misconduct. It should normally be al-lowed to do so, except in those rare cases when true prosecutorial over-reaching clearly evidences an unreasonable piling on of excessive charges, to the point where one "knows it when [he or she] sees it," . . . .

No. 200101126, 2004 CCA LEXIS 37, at *16–17 (N.M. Crim. Ct. App. 24 Feb. 2004) (unpub. op.) (second alteration in original) (citation omitted). In light as to how the record unfolded, particularly given the addition of the kiss charge, the charging in this case is close to being excessive and unreasonable and exposed Appellant to several collateral consequences. The numerous changes to the *Manual for Courts-Martial* since 2007, along with the expansion of sex offender registration requirements high-light the importance of discretion in the prosecution of offenses—AFOSI Reports of Investigations should not be treated as law school exams and not every alleged wrong should be on a charge sheet. The Government has an obligation to monitor statutory changes, and not once, but twice, was the Government on notice of the change in the law with the 2017 NDAA and the President's Executive Order.

The change in the law is wholly relevant to Appellant's unsworn statement. Appellant argues it was error on behalf of his trial defense counsel to advise him not to reference the consequences of his federal conviction that he would be required to register as a sex offender, and in fact, Appellant did not make any reference to sex offender registration requirements during his unsworn statement. The majority rightfully notes, under *United States v. Talkington*, trial defense counsel had no duty to inform the members of matters that are an improper consideration for sentencing, much less to do so through their client's unsworn statement. 73 M.J. 212, 216 (C.A.A.F. 2014) (citations omitted). In *Talkington*, the United States Court of Appeals for the Armed Forces held that "sex offender registration operates independently of the sentence adjudged and remains a collateral consequence," and "the requirement that [an a]ppellant register as a sexual offender is a consequence of his conviction that is separate and distinct from the court-martial process." 73 M.J. 212, 216–17 (C.A.A.F. 2006) (citations omitted).

However, the failure to have Appellant mention this change in the law in his unsworn statement could have easily resulted in this court not even opining in this case, as perhaps Appellant may have not received a bad-conduct discharge. By failing to mention that the charges he was convicted of are no longer sex offenses under Article 120, UCMJ, trial counsel was given ammunition to argue what can only be described as an unreasonable sentencing argument (which will be discussed shortly).

Trial defense counsel may have had valid strategic reasons for not wanting to mention sex offender registration requirements, but we do not know those reasons. This court asked for affidavits requesting information on the issue of whether the Defense failed to prepare an effective sentencing case. Appellant's civilian defense counsel did not comment on this issue, and his military defense counsel stated, "I did not advise [Appellant] to include federal sex offender registration as part of his unsworn statement." *Talkington* cautions, and in many ways, discourages trial defense counsel from raising sex offender issues, and if the subject is brought up, military judges are at liberty to provide an instruction to members that they should not consider this information for sentencing. 73 M.J. at 216. As one would expect, after they began deliberating on a sentence, members did in fact ask the military judge in Appellant's case, "[W]ill he have to register as a sex offender?" The military judge gave members the standard *Talkington* instruction, stating,

> While the accused is permitted to address these matters in an unsworn statement, these possible collateral consequences should not part [sic] of your deliberations in arriving at a sentence. Your duty [is] to adjudge an appropriate sentence for the accused based upon the offenses for which he's been found guilty,

that you regard as fair and just when it is imposed, and not one whose fairness depends upon actions that others may or may not take in this case.

Logically, most people would question how could there be ineffective assistance of counsel in this case when the military judge would have told the members to essentially disregard Appellant's reference to sex offender registration. This is a valid point, but the language in *Talkington* does not advise military judges to instruct members they are to disregard sex offender references, instead, it states: a "military judge ha[s] discretion to 'temper[ ]' [an] unsworn statement with 'appropriate instructions.' 'While the military judge's discretion in choosing whether to instruct upon such 'collateral' matters is broad, he or she is required to give legally correct instructions that are tailored to the facts and circumstances of the case.'" 73 M.J. at 217 (citations omitted).

There was no risk for the Defense in asking the military judge to use his broad discretion in tailoring an instruction based on the facts and circumstances of this case. Even had the Defense asked for, and been denied, a tailored instruction based on the change in the law as applied to Appellant's case, that ancillary issue could be before us now.[9] I subscribe to Chief Judge Baker's concurring view in *Talkington*, where he states,

> [Sex offender registration] may be the most significantly stigmatizing and longest lasting effect arising from the fact of conviction. Therefore, in my view, it is not good enough to call it collateral and leave it to the members to sort out what to make of it based on their own perceived, received, and often erroneous understanding of registration. A tailored and appropriate instruction is required.

73 M.J. at 218 (Baker, C.J., concurring). In this specific case, Appellant's failure to not mention the change in the law and sex offender registration mattered, as it prevented the military judge from having the opportunity to craft a tailored instruction based on this extraordinary issue.

Appellant was prejudiced in this error, as members were unaware of this significant issue and perhaps unreasonably believed Appellant had committed serious sex offenses. Sex offender registration may be a collateral consequence,

---

[9] The military judge asked civilian defense counsel about sex offender registration, asking, "I noticed that -- at least I didn't see that you mentioned, . . . sex offender registration anywhere in the unsworn, or -- either oral or written. Is that something that you were planning on arguing . . . ." Civilian defense counsel responded, "No. No, Your Honor."

but Appellant's case exposes a reality that not all sex-related offenses are created the same to warrant such a harsh collateral consequence, particularly given Appellant's crimes are no longer sex offenses under the Government's charging scheme. Despite the majority's comment that "[t]he owner of an accused's unsworn statement is that accused," *see United States v. Marcum*, 60 M.J. 198, 209 (C.A.A.F. 2004), given the severity of sex offender registration, Appellant should have been counseled on this; there was no benefit, nor legitimate strategic reason in failing to do so.[10] The failure by Appellant's trial defense counsel address the change in the law, and/or inclusion of this information in Appellant's unsworn statement, demonstrated ineffective assistance of counsel. I respectfully disagree with my colleagues on this assignment of error.[11]

## C. Government's Arguments during Sentencing and on "Justice"

The majority succinctly outlined trial counsel's comments made about justice, finding portions of trial counsel's argument amounted to obvious error. However, Appellant's assignment of error also mentions that trial counsel committed prosecutorial misconduct when trial counsel argued that justice would only be served if Appellant was convicted and adjudged a sufficient punishment. It is worth looking at the Prosecution's sentencing argument, where assistant trial counsel continued their theme of justice.

In terms of a punishment, assistant trial counsel argued, "I would reasonably submit and ask you to enter the government's recommended sentence of two years of confinement, reduction to the grade of E-1, and a dishonorable discharge," and stating, "*[W]e can break it down for a year for every abusive sexual contact. We're not over-asking, we're not over-reaching to try to bargain.*" (Emphasis added). Assistant trial counsel went on to say, "[Appellant] needs a significant amount of confinement time that's going to be -- that will be commensurate with the seriousness of the offenses here," and "the government, trial counsel, we sincerely hope that two years of confinement will provide him with the necessary tools he needs to reintegrate back to society. And we are

---

[10] In Appellant's clemency, Appellant did advise the convening authority that the crimes of which he was found guilty were no longer sex offenses.

[11] Further, regarding ineffective assistance of counsel, in his unsworn statement, Appellant stated he was a Peruvian immigrant.. There are two obvious questions not raised in the record: what was Appellant's immigration status at the time of trial, and, if he was not a citizen, whether a bad-conduct discharge and conviction would result in deportation. If this was an issue, and Appellant's counsel did not at least address this, it may have had an effect on sentence appropriateness at our level and additional ineffective assistance of counsel considerations.

not even near seeking the maximum amount of confinement time here, which again, is 14 years." Assistant trial counsel also stated,

> This is not an 18-year-old slick-sleeved [A]irman living in the dorms. And you cannot correct 34 years of learning bad behavior in just a few months, or even a couple years. But yet, we are still giving him the benefit of the doubt with asking for two years of confinement. He needs confinement long enough to learn to change his ways going forward.

Assistant trial counsel referred to Appellant as a "predator" 11 times and concluded the argument stating, "A sufficient punishment that will bring justice here to this case, and that will bring some form of closure to [MT] for all that she has [ ] endured in this year-and-a half nightmare . . . [is] two years of confinement, reduction to the grade of E-1, and a dishonorable discharge."

Civilian defense counsel did not object to assistant trial counsel's argument. We review prosecutorial misconduct and improper argument de novo. *United States v. Voorhees*, 79 M.J. 5, 9 (C.A.A.F. 2019) (citation omitted), *cert. denied*, 140 S. Ct. 2566 (2020). When no objection is made at trial, we review for plain error. *United States v. Andrews*, 77 M.J. 393, 398 (C.A.A.F. 2018) (citations omitted). "Plain error occurs when (1) there is error, (2) the error is plain or obvious, and (3) the error results in material prejudice to a substantial right of the accused." *Id.* at 401 (quoting *Fletcher*, 62 M.J. at 179). We do not review counsel's words in isolation; we review the argument in context of the entire court-martial. *United States v. Baer*, 53 M.J. 235, 238 (C.A.A.F. 2000) (citations omitted). If we find a prosecutor's argument "amounted to clear, obvious error," we then determine "whether there was a reasonable probability that, but for the error, the outcome of the proceeding would have been different." *Voorhees*, 79 M.J. at 9 (internal quotations marks and citations omitted). It is improper for trial counsel to make arguments that "unduly . . . inflame the passions or prejudices of the court members." *United States v. Frey*, 73 M.J 245, 248 (C.A.A.F. 2014) (quoting *United States v. Marsh*, 70 M.J. 101, 102 (C.A.A.F. 2011)).

When you look at both closing and sentencing arguments, both trial counsel were undeniably trying to inflame the passions of the members. "Thirty-four years of learning bad behavior?" This comment was made despite the fact that during his unsworn statement, Appellant told the court he was a Peruvian immigrant, with a college degree in economics, who joined the Air Force in 2017 as he "wanted to earn the privilege to be here by serving in the military." There was no evidence – none – of a lifetime of "bad behavior." One only needs to look at how the Prosecution viewed "justice" in this case by looking at their own sentence recommendation for a half-second kiss and an indeterminate stomach touching. The moment trial counsel tried to rationalize the recommendation,

any seasoned military justice practitioner would see the Government was in fact over-reaching and trying to bargain with the members by asking for an unreasonably high sentence in the hopes it would drive up the ultimate sentence adjudged by the members. A dishonorable discharge and a year in jail for a peck on the lips, and another year in jail for touching MT's stomach (with no context), indicates trial counsel were not seeking a punishment based on the offenses of which Appellant was convicted; they were seeking a punishment as if to save face for losing the gravamen offense. "[E]very attorney in a court-martial has a duty to uphold the integrity of the military justice system." *United States v. Voorhees*, 79 M.J. 5, 15 (C.A.A.F. 2019) (citation omitted). In reviewing this case de novo, it is debatable whether those prosecuting this case understood the meaning of reasonableness or justice, as this was an unfathomable recommendation based on the crimes of which Appellant was convicted and a recommendation of this sort challenged the integrity of our system. I find there was plain error with both trial counsel arguments, and given that Appellant was adjudged a bad-conduct discharge, I believe those arguments materially prejudiced Appellant, as there is a reasonable probability that the outcome of the proceeding would have been different had trial counsel not committed error.

In his closing argument, trial counsel admonished the members, "*You will have the ultimate decision on . . . whether justice will be served, or whether the accused will be acquitted,*" as if to say an acquittal would not be justice. Civilian defense counsel responded these are "words that should never come out of a prosecutor's mouth;" I agree. The majority commented that "'Justice' must be tethered to the evidence and the burden of proof lest it be confused with justice for the victim or society or the military justice system." Unfortunately for Appellant, looking at his case as a whole, I question whether "justice" has been served.

I respectfully dissent.

FOR THE COURT

CAROL K. JOYCE
Clerk of the Court